IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2018

## STATE OF TENNESSEE v. EUGENE DAVID SANDERS, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2012-C-2804     Mark J. Fishburn, Judge**

_____

### No. M2017-01916-CCA-R3-CD

_____

Defendant, Eugene David Sanders, Jr., appeals from his Davidson County Criminal Court convictions of aggravated assault and aggravated criminal trespass, for which he received an effective sentence of fifteen years to serve in the Department of Correction.  On appeal, Defendant contends that: (1) the jury's verdict was against the weight of the evidence; (2) the trial court erred by failing to instruct the jury on self-defense; and (3) the trial court erred by allowing the State to call Defendant's court-appointed private investigator as a rebuttal witness.  Following a thorough review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Kara L. Everett, Carthage, Tennessee (on appeal), and Mark Kovach (at trial), for the appellant, Eugene David Sanders, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### <u>Factual and Procedural Background</u>

In September 2012, the Davidson County Grand Jury indicted Defendant for attempted first degree murder, aggravated burglary, and aggravated assault.  The case

proceeded to trial in May 2015 on the charges of aggravated burglary and aggravated assault after the State entered a nolle prosequi to the charge of attempted first degree murder.

*State's Case-in-Chief*

Jason Haggard testified that he worked as a paramedic with the Nashville Fire Department in February 2012. On February 1, 2012, Mr. Haggard responded to a residence on Chestnut Street on an assault call. Upon arrival, Mr. Haggard found the house was in "disarray," and he could see pieces of the door jamb on the floor of the front room. The assault victim was lying on the floor near a couch. Mr. Haggard observed a large wooden stick on the floor, and based on the victim's injuries, he believed that the large wooden stick had been used to hit the victim. When asked to describe the victim's condition, Mr. Haggard stated:

> [The victim] was laying [sic] on his back and he was not really responsive when we initially tried to say "[H]ey, are you okay? Are you awake[?]" just to see if we could get any response out of him at all. He was breathing really heavily and he had lots of blood covering his face and his eyes, both of his eyes were noticeably very swollen around, just right around the orbits there, right around the eye sockets.

He explained that this was a sign of a possible skull fracture or intercranial injury. Mr. Haggard further testified:

> When we were in the house, I don't remember any sort of response from him at all. I remember him being sort of just really compliant to the point of being totally unconscious as we were putting him on the spineboard. I remember his breathing was really deep, rapid, which is another indicator of possible head injury or a closed head injury.

Mr. Haggard recalled that the victim had "lots of blood" coming from his nose and mouth and that he was "critically injured." Mr. Haggard transported the victim by ambulance to Vanderbilt Hospital. According to Mr. Haggard, the victim did not regain consciousness while en route to the hospital. Mr. Haggard stated, "[The victim] had some movement, but he was not responsive at all, so he didn't have any sort of purposeful movement and he wasn't following commands or acknowledging being talked to or anything like that."

Detective Frederick Heiman of the Metro-Nashville Police Department testified that on February 1, 2012, police dispatch received a call about a fight in which someone

had been "severely beaten." Detective Heiman initially responded to Vanderbilt Hospital, where he saw that the victim was "on a trauma board, had a neck collar and had been intubated." The victim was not conscious, and Detective Heiman was informed that the victim was in critical but stable condition. Medical staff told Detective Heiman that the victim suffered "a couple of facial fractures" but no brain injury and that the victim was expected to make a full recovery. Upon determining that he would not be able to speak to the victim, Detective Heiman went to the residence on Chestnut Street.

Sharon Tilley, a crime scene investigator with the Metro-Nashville Police Department, testified that she responded to the residence on Chestnut Street on February 2, 2012. She photographed the scene, including the front door of the residence, and noted that the door frame "appeared to be broken and damaged." Investigator Tilley stated that it appeared that the storm door had been "torn off the door frame," and there were "gouges in the door." She also observed a damaged coffee table and a shelf that had been "displaced." Investigator Tilley collected a cigarette butt, a blue jersey, a pair of blue jeans with blood on them, and a piece of wood from the crime scene. She noted that there was a pair of brown gloves in the pocket of the blue jeans.

Freddie Petway, the victim, testified that, on the night of February 1, 2012, he was at his residence on Chestnut Street, watching television with his girlfriend, Defendant, and Defendant's "girl." At one point, Mr. Petway told Defendant that Defendant could not keep "coming and going" out of his house. Mr. Petway explained that Defendant did not pay him rent; instead, Defendant wanted to "freeload" off of Mr. Petway. During this conversation, Defendant and his "girl" became angry, and Defendant hit Mr. Petway with a brick and left the residence. Mr. Petway locked his front door, but Defendant returned and "bust[ed] the door in" with a brick and a "wooden hammer." Mr. Petway testified that Defendant then hit him in the face and in the eye with the hammer and that he lost consciousness. Mr. Petway stated that he had no memory of what happened after he lost consciousness until he woke up at Vanderbilt Hospital. He explained that he was in the hospital and an "old folk[']s home" for six months after the assault. Mr. Petway testified that doctors placed a metal plate in the area of his eye and cheekbone. He stated that he had to be fed through a feeding tube because he could not swallow. Mr. Petway recalled that his girlfriend was at a nearby church getting some food when Defendant returned to Mr. Petway's residence. He testified that it was the fifth time that he had told Defendant not to come back to his house, but Defendant had "been back everyday, five days in a row, with the same girl." Mr. Petway stated that Defendant did not live with him at the house on Chestnut Street; instead, Defendant was staying "[b]y the store by the projects."

On cross-examination, Mr. Petway agreed that he had called Defendant and asked Defendant to bring him some crack cocaine and that he had told Defendant that he would pay him for the crack cocaine. Mr. Petway testified, however, that Defendant "was too

- 3 -

late coming, took him all night to come. He had to go get his girl." Consequently, Mr. Petway had already obtained crack cocaine from another source. Mr. Petway could not recall whether Defendant placed a bag of cocaine on the coffee table. Mr. Petway said that he was not swinging the wooden hammer around or showing it to Defendant before he locked Defendant out of his home. He explained that he kept the wooden hammer in order to protect himself from people coming to his door. Mr. Petway did not recall threatening Defendant with the wooden hammer, and he denied hitting Defendant with the hammer.

William Stewart testified that, in February 2012, he worked as a detective with the Metro-Nashville Police Department and was assigned to investigate the assault on Mr. Petway. Detective Stewart explained that he was originally given the name "Da-Boy" as the suspect in the assault. Through a search of a database of nicknames, Detective Stewart determined that "Da-Boy" was a nickname used by Defendant. Detective Stewart located Defendant and took him into custody. After being advised of his *Miranda* rights, Defendant admitted to being at Mr. Petway's residence on the night of the assault. Detective Stewart testified:

> [Defendant] made comments that he had been called and was asked to bring some crack cocaine. [Defendant] . . . was told that they had money, so he went to that location on . . . Chestnut Street. When he got there, there was [sic] several people there, but no one had any money. [Defendant] got into an argument with Mr. Petway, a heated argument, words were exchanged. He made comments that it was raining that day and he had arrived there with a girl by [the] name of Kiana Johnson, and she had stepped outside on the front porch during the argument with Mr. Petway. He went out to check on her or to tell her to "wait, I'll be out in a minute," at which point, and it's not real clear whether Mr. Petway shoved him out the door or whether he was standing in the door and Mr. Petway slammed the door and hit him. According to [Defendant], he was standing in the doorway, Mr. Petway slammed the door, hit him, knocked him down on the concrete. [Defendant] said it made him mad and at that point it he just lost it. He said he kicked the door in, went in, struggled with Mr. Petway, he said, "I swung at Mr. Petway, Mr. Petway swung at me once and missed. I wrestled him to the ground and I hit him in the face or punched him in the face two or three times," he said, "And then I got up and left."

Detective Stewart explained that, although the interview was not recorded, he took notes of his conversation with Defendant and then reduced his notes to a written report.

About a week later, Detective Stewart located Mr. Petway's girlfriend, Angela Stewart-Green, and interviewed her about the incident. Detective Stewart made several attempts to speak to Mr. Petway, but the detective recalled:

> Every time that I checked or went by and saw him, he was either unconscious or he was intubated where he could not speak. At one point he could speak, but it just didn't seem like anything I asked him was registering with him at all. He just wasn't coherent.

On cross-examination, Detective Stewart agreed that Defendant said that Mr. Petway was swinging a wooden stick or mop handle around earlier in the night and spit in Defendant's face before Mr. Petway kicked Defendant out of his residence. He recalled that Defendant showed remorse when told about Mr. Petway's condition, and Defendant claimed that it had not been his intent to severely injure Mr. Petway.

*Defendant's Proof*

Defendant testified that, on February 1, 2012, he was at a convenience store with Kiana Johnson when he received a phone call from Mr. Petway, who said that "they had some money at the house" and asked Defendant to bring him $50 worth of crack cocaine. Defendant testified, "I told Mr. Petway that I didn't have any drugs at that time, he said, 'Well you need to get you some now because there's plenty of money up here.' So I said, 'I'll snatch me some and I'll probably come on the way.'" Defendant obtained some cocaine, and he and Ms. Johnson went to the residence on Chestnut Street. Defendant testified that the door to the residence was open when he arrived and that there were five or six people in the residence. Defendant claimed that he lived in the Chestnut Street residence; he kept clothing there and had a key to the residence. He explained that, when he arrived at the house with the cocaine, Mr. Petway said, "Let me get something." Defendant responded, "Let you get something? . . . [W]here the money at [sic]?" Mr. Petway then informed Defendant that "nobody got no [sic] money." Defendant testified that Mr. Petway said, "B****, I'm not paying you nothing [sic] [,]" and he ordered Defendant to get out of his house while swinging a wooden stick around. Ms. Johnson, who was already getting high, said, "Y'all blowing my high, I gotta go[,]" and she stepped out onto the front porch. Defendant said that he stepped out the front door to check on Ms. Johnson. According to Defendant, while he was standing in the doorway, Mr. Petway "hit [him] with the stick" and pushed Defendant out of the doorway, causing Defendant to slip and fall. Defendant explained that he was hurt in the fall and responded "against [his] better judgment." Defendant admitted that he "forced [his] way back in" Mr. Petway's residence. He stated, "When I went back in the house Mr. Petway hit me, we was fighting." He said that Mr. Petway "still had the stick in his hand, he was still

swinging the stick and we got into it, it was just a -- just a fight, I got the better end of the stick, he lost and got the short end of the stick[.]"

During a jury-out hearing following Defendant's direct examination, the following colloquy occurred:

THE COURT: If I charge the jury on self-defense, then the law allows the State to get into your prior aggravated assaults.

[DEFENDANT]: Yes, sir.

THE COURT: Because one of the things that the jury would have to determine is who the first aggressor was[.]?

[DEFENDANT]: Yes, sir.

THE COURT: Also there will be an issue that, this being in his home, and I don't know if I have the most updated one, if I were to charge self-defense, not only would the State be allowed to introduce your prior aggravated assaults, since this happened at his home, the jury would also be advised that his swinging the club at you, there's a presumption that he was doing so to protect himself because he was presumed to have held a reasonable fear of imminent peril of death or serious bodily injury, which would justify him doing what he did, if the jury finds you unlawfully entered the premises.

So, my point is, since this just came up in your testimony, I had no idea about the self-defense possibility, I thought it best that we stop and you and your attorney talk as to whether or not you want to pursue self-defense because, to be honest, it appears to me that the evidence is justified maybe that charge being given, I just don't know whether or not you want it given, under the circumstances, and I think you and your attorney need to discuss that before we go any further with the General's cross-examination . . . so I can make a determination as to whether these aggravated assaults come in or stay out, as I've already ruled. If we're going down a new path, I need to know now, so I think you need to make a conscious, intelligent, voluntary decision as to whether or not you want to put self-defense before this jury and also your prior history with aggravated assaults and this being in his house where the law says it's all right for him to defend himself if someone forces their way into his house. I just want to you understand that and make a decision before we go any further. So we're going to take a few

- 6 -

minutes, let you and [defense counsel] discuss that issue, I just need to know, if you say you want self-defense, I'm telling you the way things are going to go if that's what you want. If you don't want it, we'll proceed as we are, nothing else is brought up about your prior record and your prior convictions on agg[ravated] assault or anything else.

Following a recess, defense counsel announced, "Your Honor, we would like to go with the self-defense strategy[.]" The trial court replied:

I am wondering even if self-defense should even be charged. When you look at the instruction it says the threat or use of force against another by the defendant is not justified if the defendant consented to the exact force used or attempted by the other individual. I mean, he forced his way in the door and he sees him swinging this stick and chooses to go forward with it anyway.

. . . .

[Defendant] placed himself in that situation. He consented to go back in by forcing his way in the door . . . and proceeded. He saw what the guy was doing and proceeded to get into the struggle with him anyway.

. . . .

I just don't think that under the facts of this case from what I've heard from [D]efendant, in looking at it in light most favorable to him, that it really raises a legitimate self-defense argument. He forced his way back into a situation that he knew was already volatile.

. . . .

There is no reason to have to concern yourself with self-defense if you don't reenter the premises that you were just forced out of. I'm not going to charge self-defense.

On cross-examination, Defendant acknowledged that he had four prior convictions for theft. He further acknowledged that he was frustrated and upset with Mr. Petway after he learned that Mr. Petway could not pay for the drugs. Defendant stated that Mr. Petway "already owed [him] $250 before he called me for the $50 worth of crack cocaine." He explained that, after Mr. Petway told him to leave the residence, Mr. Petway hit him with the wooden stick and pushed him out the door. Defendant admitted

that he was mad at Mr. Petway when he forced the door back open and forced his way back into the house. He stated that Mr. Petway "never had the chance to hit [him] again with that stick" but that they were "fighting." He agreed that he hit Mr. Petway in the face with his fist but denied ever hitting Mr. Petway with the wooden stick.

Angela Stewart-Green testified for Defendant. She stated that, on the night of the incident, Mr. Petway called her and asked her to "bring him some drugs." Ms. Stewart-Green stayed at the residence and "continued to . . . get high," and she recalled that Defendant arrived about thirty minutes later. Defendant took off his socks and shoes because he had walked in the rain to Mr. Petway's residence. She said that Mr. Petway began beating on the walls with a wooden stick, causing Ms. Johnson to leave the residence. Ms. Stewart-Green recalled that Defendant stood in the doorway to tell Ms. Johnson to come back inside, and then Mr. Petway "slammed the door on him." Defendant knocked on the door for Mr. Petway to let him in, but when Mr. Petway did not comply, Defendant "kicked the door in." Ms. Stewart-Green testified that, after Defendant kicked in the door, "they had started arguing and then [Defendant] started to put his shoes and socks and things back on. As he was bending down I recall Mr. Petway hitting him with stick." She stated that Defendant then hit Mr. Petway three or four times. Defendant then continued to put on his socks and shoes and left the residence. Ms. Stewart-Green called 911 because Mr. Petway was bleeding profusely and did not appear to be breathing.

On cross-examination, Ms. Stewart-Green acknowledged that she had been smoking crack cocaine on the night of the offense and agreed that her memory of that night was "somewhat spotty." She agreed that Detective Stewart interviewed her on February 12, 2012, and that she did not tell the detective that Mr. Petway hit Defendant with the wooden stick. She told Detective Stewart that Defendant was hit by the door and knocked down and that this made Defendant angry. Ms. Stewart-Green also told Detective Stewart that, after Defendant kicked in the door, he "jumped in [Mr. Petway's] face" and hit Mr. Petway. She recalled, "[W]hen [Mr. Petway] tried to hit back [Mr. Petway] fell down on the floor and [Defendant] started beating him." Ms. Stewart-Green told Detective Stewart that Defendant was hitting Mr. Petway in the face, and she attempted to stop Defendant. However, Ms. Stewart-Green testified that some of the things she told Detective Stewart were not true and stated that her memory was better at the time of trial. She said that she did not recall talking to a defense investigator about the case in 2014. She denied telling the defense investigator that Defendant took the wooden stick from Mr. Petway and hit him in the face and beat him with his fist. Ms. Stewart-Green testified that Defendant did not live at Mr. Petway's residence, but he would "crash out there sometimes."

- 8 -

*State's Rebuttal Proof*

Prior to the State calling its rebuttal witnesses, the following colloquy took place:

[DEFENSE COUNSEL]: Then Mr. Wells is coming with -- I contacted him, he's on his way.

THE COURT: Is he going to testify too?

[DEFENSE COUNSEL]: I don't know if the State intends to call him as a rebuttal witness, I think they may.

[THE STATE]: I think that he might be a witness as it relates to impeachment.

THE COURT: For the State?

[THE STATE]: Uh-huh (affirmative).

THE COURT: His private investigator?

[THE STATE]: Uh-huh (affirmative).

THE COURT: The [D]efendant's private investigator?

[THE STATE]: That is correct, Your Honor, that's one of the reasons that I've been having a moment processing. It's an odd situation, that's what I'm -- I'm not exactly sure what all the ramifications of that are.

[DEFENSE COUNSEL]: And Your Honor, if I may have a moment to speak with [Defendant] in the back real quick?

THE COURT: Yea, just trying to process this mentally, how this works.

(Whereupon, [defense counsel] and [Defendant] stepped into the back.)

THE COURT: I'm just trying to wrap my head around the State calling the [D]efendant's private investigator. Tell him to come in here.

(Whereupon, Mr. Patrick Wells entered the courtroom.)

THE COURT: I don't want you to answer this yet, Mr. Wells, but I do at some point in time, I've just been advised that you may be called as a rebuttal witness by the State.

MR. WELLS: Yes, sir.

THE COURT: I'm just trying to wrap my head around the ethics and propriety of that type of thing happening. I don't know if there's, from your standpoint as a private investigator, if your code of conduct allows you to basically end up being an adverse witness to your own client. Just never in my life had this come up before, so. Seems to me it's work product.

[THE STATE]: It's *Jencks* material. He has written notes from his interview with the witness, which –

THE COURT: I haven't looked at 26.2 in so long because y'all have open-file discovery, it's never applicable anymore.

(Whereupon, [defense counsel] and [Defendant] reconvened into the courtroom for the following proceedings.)

THE COURT: See if we even get to that point. There doesn't appear to be anything in 26.2 that exempts the statement being turned over . . . .

The State called Patrick Wells as a rebuttal witness without objection from Defendant. Mr. Wells testified that he was a private investigator for the defense and that he had interviewed several witnesses on Defendant's behalf in 2014. Mr. Wells explained that he attempted to contact Ms. Stewart-Green at several addresses and was unsuccessful. He then received a phone call from someone who identified herself as Ms. Stewart-Green. Ms. Stewart-Green spoke to Mr. Wells about the assault on Mr. Petway, telling him specific details about the offense. Following his conversation with Ms. Stewart-Green, Mr. Wells prepared a written report. Mr. Wells identified a copy of his report and read the following from the report:

At some point [Defendant] retrieved the mop handle that Mr. Petway had previously had and started assaulting Mr. Petway. Mr. Petway was begging [Defendant] to stop beating him with the mop handle and with his

- 10 -

fist.  Mr. Petway started bleeding profusely from the mouth and head area.  Ms. Stewart[-Green] . . . asked [Defendant] to quit, he eventually did and left the area.  Everyone left the area at that point.

On cross-examination, Mr. Wells explained that his interview with Ms. Stewart-Green was conducted over the phone.  He stated that, in his experience, witnesses often say things to him during interviews that are not true.

The State next recalled Detective Stewart, who testified that when he interviewed Defendant he did not see any injuries to Defendant's head.  Detective Stewart said that he did not physically check Defendant's head but that he sat and spoke to Defendant for thirty minutes.

Following deliberations, the jury found Defendant guilty of aggravated assault and aggravated criminal trespass, as a lesser-included offense of aggravated burglary.  At a subsequent sentencing hearing, the trial court found that Defendant was a career offender and sentenced Defendant to concurrent terms of fifteen years at sixty-percent for aggravated assault and eleven months and twenty-nine days for aggravated criminal trespass.  Defendant's judgments of conviction were entered on June 25, 2015.

Defense counsel did not file a timely motion for new trial.  Defendant, pro se, filed an untimely notice of appeal.  Thereafter, this court issued a show cause order, directing defense counsel to explain why Defendant's appeal should proceed.  In response, defense counsel informed this court that Defendant had told him that he did not wish to proceed with an appeal.  The record, however, did not reflect that defense counsel obtained a written waiver of appeal or moved to withdraw from further representation.  In his response, defense counsel further explained that Defendant now wanted to proceed with an appeal, and he asked permission to pursue a delayed motion for new trial in the trial court.  On November 3, 2015, this court dismissed Defendant's pro se notice of appeal without prejudice so that Defendant could file a motion for new trial and pursue an appeal "in accordance with the applicable rules."

On December 2, 2016, Defendant filed a petition for post-conviction relief, requesting a delayed direct appeal.  The post-conviction court found that Defendant's counsel was ineffective for failing to file a timely motion for new trial.  Accordingly, the post-conviction court entered an order on June 26, 2017, staying post-conviction proceedings and allowing Defendant to pursue a delayed direct appeal.  Defendant then filed a timely motion for new trial and amended motion for new trial.

At a hearing on the motion for new trial, the trial court made the following comment about the self-defense jury instruction:

I did not charge self-defense jury instruction because the evidence was that [Defendant] kicked in the door and the injuries caused occurred after the kicking in of the door, self-defense requires that you be in a place that you lawfully have a right to be, and that you're not committing some type of illegal act and obviously the jury found that he had committed an illegal act, at least by trespassing.

Regarding Mr. Wells's testimony, the State clarified that it had originally subpoenaed Ms. Stewart-Green, but when she arrived for court, she gave a statement different than any other statement she had given to police. The State immediately notified defense counsel about Ms. Stewart-Green's differing statements, and they discussed whether either party intended to call her as a witness. The State explained that it had an agreement with defense counsel to share witness statements and that defense counsel had shared a report from Mr. Wells containing Ms. Stewart-Green's statement to him.[1] The State called Mr. Wells as a rebuttal witness to provide proof of Ms. Stewart-Green's prior inconsistent statement. The trial court found that Defendant had waived any privilege he had with the investigator and denied the motion for new trial. This timely appeal follows.

## Analysis

### 1. Sufficiency of the evidence

Defendant first contends that the jury's verdict, finding Defendant guilty of aggravated assault, was contrary to the weight of the evidence.[2] He asserts that the State offered "no proof of [Defendant's] intent or knowledge that his actions would result in serious bodily injury[.]" The State responds that the evidence was sufficient to support the jury's conclusion that Defendant was guilty of aggravated assault beyond a reasonable doubt.

Rule 33(d) of the Tennessee Rules of Criminal Procedure states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule is the modern equivalent of the "thirteenth juror rule" and requires the trial court to weigh the evidence and grant a new trial "if the evidence preponderates against the weight of the verdict." *State v. Blanton*, 926 S.W.2d 953, 958

---

[1] In response to the State's assertions, post-conviction counsel acknowledged that the report from Mr. Wells had been provided to the State, apparently by defense counsel.

[2] In his brief, Defendant does not challenge the sufficiency of the evidence as it relates to his conviction for aggravated criminal trespass.

(Tenn. Crim. App. 1996). Our supreme court has stated that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[ ] and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). When a trial judge overrules a motion for new trial, absent any evidence that the trial court expressed dissatisfaction or disagreement with the weight of the evidence or the verdict, this court presumes that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the sufficiency of the evidence. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

Here, the record reflects that the trial judge approved the jury's verdict and fulfilled his duty as the thirteenth juror. Accordingly, we must determine whether the evidence presented at trial was sufficient to support Defendant's conviction for aggravated assault.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and . . . causes serious bodily injury to another[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A)(i) (2012). "A person commits assault who: (1) [i]ntentionally, knowingly, or recklessly causes bodily injury to another; (2) [i]ntentionally or knowingly causes another to reasonably fear imminent

- 13 -

bodily injury; or (3) [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offense or provocative." Tenn. Code Ann. § 39-13-101(a)(1)-(3) (2012). "Serious bodily injury" is "bodily injury that involves: (A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) [a] broken bone of a child who is eight (8) years of age or less[.]" Tenn. Code Ann. § 39-11-106(34) (2012). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(2) (2012).

When viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's conviction for aggravated assault. Mr. Petway ordered Defendant out of his residence and locked his front door. Defendant then returned and "bust[ed] the door in." Defendant immediately began hitting Mr. Petway in the face and in the eye multiple times with a wooden stick, knocking out Mr. Petway. Mr. Petway appeared to be unconscious when the paramedics arrived, and he had to be transported to Vanderbilt Hospital. Mr. Petway testified that he had no memory of what happened after he lost consciousness but that he later woke up in the hospital. He explained that he was in the hospital and an "old folks home" for six months after the assault. He testified that doctors placed a metal plate in the area of his eye and cheekbone due to fractures in his face and that he had to be fed through a feeding tube because he could not swallow. Defendant forced his way into Mr. Petway's residence after he had been locked out, and he immediately began hitting Mr. Petway. The evidence is more than sufficient to support Defendant's conviction for aggravated assault involving serious bodily injury.

Defendant asserts that the evidence does not support his conviction because there was no proof that he intended to cause serious bodily injury or knew that his actions would result in serious bodily injury; however, this court has previously held that, under the plain language of our aggravated assault statute, "it is clear the mens rea element of intentionally and knowingly is limited in application . . . to the commission of assault as defined in section 39-13-101." *State v. Jones*, 341 S.W.3d 318, 321 (Tenn. Crim. App. 2010). The mens rea element does not apply to the result of the assault, *i.e.*, seriously bodily injury. *Id.* at 321-22. Thus, Defendant's argument is without merit, and he is not entitled to relief on this issue.

### 2. Self-defense instruction

Defendant also contends that the trial court erred by failing to instruct the jury on self-defense. Defendant argues that the trial court foreclosed Defendant's reliance on a theory of self-defense by "making itself the trier of fact," determining that Defendant

"forced his way back into the residence" and "placed himself in that situation."[3] The State responds that because the issue of self-defense was not fairly raised by the proof, the trial court properly declined to provide a self-defense instruction to the jury.

Whether the jury instructions were proper is a mixed question of law and fact, which this court reviews de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001). Under Tennessee law, a trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); *see also* Tenn. R. Crim. P. 30(d)(2). This obligation "extends to general defenses, such as self-defense, defense of another, or defense of a habitation." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (footnote omitted).

When evidence adequately supporting self-defense is admitted at trial, the question of whether an individual acted in self-defense is a factual question for the jury. *See State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). However, before a trial court may submit a defense question to a jury, the proof must fairly raise an issue as to the existence of that defense, and the defendant has the burden of introducing such proof. Tenn. Code Ann. § 39-11-203(c), Sentencing Comm. Cmnts. "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. In determining whether a general defense has been fairly raised by the proof, a trial court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. *Id.* If the evidence fairly raises the issue of self-defense, the trial court is required to submit the instruction to the jury. *Id.*

Tennessee's self-defense statute provides, in pertinent part:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no

---

[3] In his brief, Defendant asserts that the jury should have been instructed on self-defense but fails to explain how the issue was raised by the proof. Because Defendant failed to make a specific argument in this respect, our analysis will, necessarily, focus on the propriety of the trial court's ruling and its reasoning.

duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(1)-(2). Importantly, the threat or use of force against another is not justified "[i]f the person using force consented to the exact force used or attempted by the other individual[.]" Tenn. Code Ann. § 39-11-611(e)(1); *see also Hawkins*, 406 S.W.3d at 128 (stating that the defense of self-defense is generally not available if the defendant "consented to the danger").

In this case, the trial court found that self-defense was not fairly raised by the proof and denied Defendant's request for a self-defense instruction. The trial court reasoned:

> When you look at the [self-defense] instruction it says the threat or use of force against another by the defendant is not justified if the defendant consented to the exact force used or attempted by the other individual. I mean, he forced his way in the door and he sees him swinging this stick and chooses to go forward with it anyway.
>
> . . . .
>
> [Defendant] placed himself in that situation. He consented to go back in by forcing his way in the door . . . and proceeded. He saw what the guy was doing and proceeded to get into the struggle with him anyway.
>
> . . . .
>
> I just don't think that under the facts of this case from what I've heard from the [D]efendant, in looking at it in light most favorable to him, that it really raises a legitimate self-defense argument. He forced his way back into a situation that he knew was already volatile.

During his testimony, Defendant stated that Mr. Petway told him to leave the residence, hit him with a wooden stick, pushed him out the door, and locked it. This angered Defendant, and he kicked in Mr. Petway's door. Defendant said that Mr. Petway "still had the stick in his hand, he was still swinging the stick and we got into it, it was just a -- just a fight, I got the better end of the stick, he lost and got the short end of the stick[.]" He stated, "When I went back in the house Mr. Petway hit me, we was [sic] fighting." Defendant stated that Mr. Petway "never had the chance to hit [him] again with that stick[,]" but they were fist fighting. The trial court's finding that Defendant consented to Mr. Petway's use of force when he re-entered the residence is clearly supported by Defendant's own testimony. As previously noted, the defense of self-defense is generally not available if the defendant "consented to the danger." *Id.*; *see also* Tenn. Code Ann. § 39-11-611(e)(1). Because Defendant did not introduce evidence sufficient to "fairly raise" an issue as to the existence of self-defense, he is not entitled to relief on based on this claim.

### 3. State's rebuttal witness

Defendant contends that the trial court erred by allowing the State to call Mr. Wells as a rebuttal witness because his communications with defense counsel were privileged under Tennessee Code Annotated section 24-1-209. Additionally, Defendant asserts that Mr. Wells's report containing Ms. Stewart-Green's statement was specifically prohibited from reciprocal discovery pursuant to Rule 16(b)(2) of the Tennessee Rules of Criminal Procedure. The State responds that the trial court properly allowed the State to call Mr. Wells as a rebuttal witness.

*Investigative privilege*

Defendant is correct that Mr. Wells's communications with defense counsel were privileged under Tennessee law. Tennessee Code Annotated section 24-1-209 states that "[c]ommunications between an attorney and a private detective or investigator hired by such attorney, while acting in their respective capacities shall be privileged communications." Tenn. Code Ann. § 24-1-209. In denying Defendant's motion for new trial, however, the trial court specifically found that Defendant waived this privilege by sharing with the State the report from Mr. Wells containing Ms. Stewart-Green's prior statement. Defendant cannot now raise a claim of investigative privilege when he voluntarily provided the State with the report from Mr. Wells. Moreover, Defendant did not object to the State's calling Mr. Wells to testify as a rebuttal witness. Because Defendant failed to raise a contemporaneous objection, we conclude this issue is waived. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) (concluding that the failure to make a contemporaneous objection constitutes waiver of an issue on appeal); Tenn. R.

App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

*Rule 16 discovery*

Moreover, we reject Defendant's contention that Rule 16(b)(2) of the Tennessee Rules of Criminal Procedure prohibited defense counsel from turning over Mr. Wells's report to the State as reciprocal discovery. Rule 16(b)(2) provides:

> (2) Information Not Subject to Disclosure. Except as to scientific or medical reports, this subdivision does not authorize the discovery or inspection of:
>
> > (A) reports, memoranda, or other internal defense documents made by the defendant or the defendant's attorneys or agents in connection with the investigation or defense of the case; or
> >
> > (B) a statement made by the defendant to the defendant's agents or attorneys or statements by actual or prospective state or defense witnesses made to the defendant or the defendant's agents or attorneys.

Tenn. R. Crim. P. 16(b)(2) (2015). The rule does not require a defendant to turn over statements made by potential defense witnesses to the defendant or the defendant's agent during pretrial discovery; however, it does not prevent a defendant from doing so. *See* Tenn. R. Crim. P. 16, Advisory Comm'n Cmts ("The voluntary disclosure of evidence not within the ambit of this rule is encouraged by the commission."). Rule 16(b)(2) did not prevent defense counsel from voluntarily turning over Ms. Stewart-Green's statement to Mr. Wells during pretrial discovery.[4] This issue is without merit.

---

[4] As noted by the State in its brief, it is unclear from the record whether Mr. Wells's report contained *Jencks* material, which would have been subject to mandatory disclosure under Tennessee Rule of Criminal Procedure 26.2. *See* Tenn. R. Crim. P. 26.2.

## Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE